# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **RYAN SCARBROUGH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 4:23-CV-1147 PLC** |
| | ) |
| **LELAND DUDEK[1],** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Plaintiff Ryan Scarbrough seeks review of the decision of Defendant Acting Social Security Commissioner Leland Dudek, denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  For the reasons set forth below, the Court affirms the Acting Commissioner's decision.

### I.    Background and Procedural History

On December 26, 2019, Plaintiff filed an application for DIB, alleging he was disabled as of February 1, 2016, due to "[sciatic] R side, 2 herniated disc, 2 bulging disc, my legs go numb, ptsd."  (Tr. 70, 86, 187-191)  The Social Security Administration ("SSA") denied Plaintiff's claim initially and on reconsideration on August 28, 2020, and January 27, 2021, respectively.  (Tr. 86, 111)  Plaintiff filed a timely request for a hearing before an administrative law judge ("ALJ").  (Tr. 129-130)  The SSA granted Plaintiff's request for review and conducted a hearing in May, 2022.  (Tr. 35-69)

---

[1] Leland Dudek became the Acting Commissioner of Social Security on February 18, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek shall be substituted for Kilolo Kijakazi as the Defendant in this suit.  *See* 42 U.S.C. § 405(g).

In a decision dated January 24, 2023, the ALJ determined that Plaintiff "was not under a disability within the meaning of the Social Security Act from February 1, 2016, through the date last insured." (Tr. 11)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-6)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

## II.    Evidence Before the ALJ

Plaintiff, born April 3, 1985, testified that he went to school through 12th grade, and served in the military for approximately ten-and-a-half years before he was medically discharged.  (Tr. 43, 44)  While serving in the military, Plaintiff stated that he was deployed to Iraq once and Afghanistan once.  (Tr. 44)

Plaintiff testified that he lived in a house with his wife and 5-year old daughter.  (Tr. 43) Plaintiff stated that his wife worked outside the home, and he cared for his daughter with the help of his parents, his brother and a babysitter.  (Tr. 43-44)  With respect to his abilities and activities, Plaintiff stated that while he used to fish and hunt a lot, he rarely did so anymore, and only hunted if someone were with him at all times.  (Tr. 60)  He confirmed he was not involved in church activities or socialization of any kind with family or friends, and did not go to the grocery store or pharmacy.  (*Id.*)  Plaintiff said he tried to help with household chores to the best of his ability, sweeping, mopping and doing dishes until he needed to take a break and sit down.  (Tr. 61)

When Plaintiff's representative asked about the medical problems Plaintiff experienced that affected his ability to work, Plaintiff responded as follows:  "My back, lower back, which the medical called it degenerative disc disease, that I was told.  My right knee, my left ankle, the PTSD."  (Tr. 47)  Plaintiff testified that he had surgery on his back, a microdiscectomy, but that

he believed his condition worsened after the surgery.  (*Id.*)  Specifically, Plaintiff stated that while he used to fall or stumble five to ten times a day before the surgery, he now falls or stumbles fifteen to twenty times and often uses a walker.  (Tr. 47-48)  He attributed the instability to his left ankle, describing the situation as follows:  "My ankle gives out and I lose all strength in it where I have to sit there and lean on something for about five to ten minutes until I get my strength back in my ankle and I'm able to walk again."[2]  (Tr. 52)  Plaintiff testified that he broke his ankle in 2018, "because one of my episodes, when I stumbled because my ankle gave out, I rolled it and I fractured my ankle bone."  (Tr. 53)  He stated that while he had a steroid shot for the pain, it did not have a noticeable effect.  (*Id.*)

Plaintiff further asserted his right leg and right knee swell "all the time", but his doctors were unable to find a cause for the inflammation.[3]  (Tr. 48-49)  He stated that he tried to keep his leg straight, and spent forty to fifty percent of his days sitting in a recliner or laying down.  (Tr. 49)

Plaintiff's attorney questioned him regarding his physical capabilities.  Plaintiff testified that he was able to stand and/or walk for about five minutes, but that within those five minutes he was "100 percent going to stumble and fall[.]"  (Tr. 54)  Plaintiff stated that he was able to sit for 15 to 20 minutes before experiencing pain and having to lay down.  (Tr. 54-55)  Plaintiff stated that while he was afraid to attempt lifting, he believed ten pounds to be the heaviest weight he could manage.  (Tr. 55)

---

[2] Plaintiff testified that he had two surgeries on his left ankle, both while he was on active duty with the military.  (Tr. 52)

[3] Plaintiff testified that he had two surgeries on his right knee, again both while he was on active duty with the military.  (Tr. 50)  He further stated that while his doctors recommended that he wear a brace on his knee, he did not because it was uncomfortable.  (Tr. 51)

With respect to his PTSD, Plaintiff testified that he stopped driving on a routine basis in 2017. (Tr. 55) Plaintiff explained the change as follows: "I just couldn't do it anymore. Usually, like, when I drove, when I've seen, like, a white water tank, tank truck, it happens to trigger my PTSD."[4] (Tr. 55-56)

Plaintiff testified that his PTSD caused other problems in terms of functioning during the day. (Tr. 56) He stated it was difficult for him to concentrate in groups of two or more people, as follows: "It's hard for me to concentrate on my talking and I just feel nauseous and dizzy and most of the time just need to go lay down for about an hour or two by myself to calm down."[5] (Id.) Plaintiff further mentioned that his PTSD caused him to feel stressed and lash out for no reason. (Tr. 57) For example, Plaintiff explained that his memory is impaired, and if his wife questions why he forgot something, "I just snap at her and say I don't know why, pretty much, and then it just leads to a huge argument." (Tr. 59) Plaintiff acknowledged that while he experienced homicidal thoughts at the time of his discharge from the military, those thoughts had subsided. (Tr. 58) Plaintiff opined that should he resume interactions with other people, however, the thoughts would increase. (Id.) He explained this conclusion as follows: "It just feels like if I'm— if I was to go out, it would feel like—I would just have thoughts of people were out there to harm me, and, like, me being watched and people harming me and then it just feels like whatever I have to do. Like, I mean, harm them before they end up doing something to me." (Id.)

Plaintiff testified that based on his understanding of flashbacks, he believed he experienced them. (Tr. 58) Plaintiff explained his experiences as follows: "I blank out and I—I blank out, the

---

[4] Plaintiff testified that he rarely left the house, and when he did his wife would drive and he would lay down. (Tr. 48) According to Plaintiff, he lays down "because of being outside. That's part of my PTSD problem." (Id.)

[5] Plaintiff clarified that he did not experience this symptom inside his home, and therefore rarely left the house. (Tr. 56-57)

4

flashback that I have.  All I can remember is driving and see a water tank because a water tank in Afghanistan, it was actually a VBIED.  I'm not sure if you're familiar with a VBIED, or a vehicle IED.  And a water tank blew up in Afghanistan, and usually when I see one, like, on the road, I will black out."  (Tr. 58-59)  Plaintiff stated he rarely had these events when at home, but they could be triggered by a truck sound.  (Tr. 59)

A vocational expert testified at the hearing.  (Tr. 64-68)  The ALJ noted that for purposes of the hearing, Plaintiff did not have any prior relevant work.  (Tr. 64)  The ALJ asked the vocational expert to consider a hypothetical individual similar in age and education to Plaintiff, and with the following limitations:

> [L]imited to sedentary work as that term is defined in the Selected Characteristics of Occupational Exploration (PHONETIC) appendix C, paragraph 1, I believe, never climb ladders, ropes, or scaffolds.  Never balance as that term is defined in the Selected Characteristics of Occupational Exploration appendix C, paragraph 3, I believe.  Occasional climbing ramps and stairs with a rail.  And occasionally stoop, kneel, crouch, and crawl.  Avoid all exposure to full body vibration and workplace hazards such as unprotected heights.
>
> The hypothetical individual has the ability to understand, remember, and carry out routine tasks.  Simple, routine tasks, I'm sorry.  To maintain attention and concentration sufficient to complete simple, routine tasks.  Has the ability to make gradual, minimal changes in job duties or setting relative to simple, routine tasks.  Can tolerate job responsibilities that involve occasional contact with the public, coworkers, and supervisors.  Again, involving simple, routine tasks.

(Tr. 64-65)  The vocational expert opined that such an individual would be able to work as a document preparer, addresser, and bonder.[6]  (Tr. 65)  When the ALJ altered the hypothetical to eliminate kneeling, crouching, crawling, paced production quotas, assembly line type work, and tandem tasks, the vocational expert stated the same positions would be available.  (*Id.*)  The

---

[6] The vocational expert testified that all three proposed positions were classified as sedentary, unskilled.  (Tr. 65)

vocational expert further stated there would be no job erosion should the individual be restricted to positions that did not require interaction with the public.  (Tr. 65-66)

The vocational expert testified that two or more unexcused or unscheduled absences per month would result in termination.  (Tr. 66)  She further stated that off-task behavior at a rate of 15% or more of the workday would result in termination.  (Tr. 66-67)

Plaintiff's representative asked the vocational expert whether an individual who required "significant accommodation or assistance in order to successfully concentrate, understand things, or apply information" would be capable of performing the jobs she indicated.  (Tr. 67)  The vocational expert responded that should the hypothetical individual require "redirection several times a day to get assistance to do the job, you know, that would be accommodated work and it would not be tolerated on a competitive basis at all[.]"  (Tr. 68)

With regard to Plaintiff's medical records, the Court considers the facts set forth in Plaintiff's Statement of Uncontroverted Facts, and the Acting Commissioner's responses thereto. (ECF Nos. 21-1, 22-1)  The Court will cite to specific portions of the transcript as needed to address the parties' arguments.

### III.    Standards For Determining Disability Under The Social Security Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992).  Under the Social Security Act, a person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).

6

The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At step one, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611.  At step two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the [twelve-month] duration requirement in § [404.1509], or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii); *McCoy*, 648 F.3d at 611.  To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At step three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611.  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process.  20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

7

Prior to step four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. § 404.1520(a)(4), which is "the most [a claimant] can still do despite [his or her] limitations," 20 C.F.R. § 404.1545(a)(1). *See also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). At step four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. At step five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g); *McCoy*, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1520(g).

## IV.    The ALJ's Decision

The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520(a), and found that Plaintiff: (1) had not engaged in substantial gainful activity during the period from his alleged onset date of February 1, 2016, through his date last insured of March 31, 2021; and (2) had the following severe impairments: degenerative disc and joint disease of the lumbar spine,

osteoarthritis of the right knee, status-post fractures of the left ankle, obesity, post-traumatic stress disorder, generalized anxiety disorder, and major depressive disorder, that significantly limited his ability to perform basic work activities as required by SSR 85-28. (Tr. 12-13)

At step three, the ALJ concluded that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-15) As relevant here, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15." (Tr. 14) In so finding, the ALJ first considered the "paragraph B" criteria, noting that to satisfy said criteria, "the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning." (*Id.*)[7] After discussing Plaintiff's mental limitations, including those set forth in Plaintiff's hearing testimony and Function Report, the ALJ found that Plaintiff had moderate limitations in the following areas:  understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (Tr. 14-15) The ALJ thus concluded that "[b]ecause the claimant's mental impairments did not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria were not satisfied." (Tr. 15)

The ALJ further concluded the evidence failed to establish the "paragraph C" criteria were satisfied, as Plaintiff's mental disorders "are not 'serious and persistent,' in that:  the medical record does not reveal treatment, mental health therapy, psychosocial support(s), or a highly

---

[7] The ALJ noted that an extreme limitation "is the inability to function independently, appropriately, or effectively, and on a sustained basis", while a marked limitation "is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis." (Tr. 14)

structured setting(s) that is ongoing and diminishes the symptoms and signs of the mental disorders; and the record is void of evidence of marginal adjustment, described as minimal capacity to adapt to changes in the claimant's environment or to demands that are not already a part of the claimant's daily life." (Tr. 15)

The ALJ found that, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 17)  For example, the ALJ noted that while Plaintiff testified to numerous deficits, both physical and mental, he remained "able to engage in various typical activities of daily living", including caring for his child, preparing complete meals (with help from his wife), managing his finances, shopping online, driving, and going out in public alone. (Tr. 16-17)

The ALJ then turned to the medical opinions in the record.  State-agency physicians Renu Debroy, M.D., and Michael O'Day, D.O., issued findings on August 27, 2020, and January 27, 2021, respectively. (Tr. 70-85, 87-110)  The ALJ summarized Drs. Debroy and O'Day's findings as follows:

> [Drs. Debroy and O'Day] each found the claimant capable of performing work at the sedentary exertional level, occasionally able to climb (ladders, ropes, scaffolds, ramps and stairs), stoop, kneel, crouch and crawl, frequently able to balance, and to need to avoid concentrated exposure to vibration and hazards.

(Tr. 19)  The ALJ found the doctors' conclusions partially persuasive, as they "attempted to support their conclusions with summaries of the evidence available when the findings were rendered." (Tr. 20)  The ALJ noted the findings were not entirely consistent with the record as a

whole, however, as subsequently received evidence, including Plaintiff's hearing testimony, demonstrated that Plaintiff required greater limitations. (*Id.*)

The ALJ next considered the opinions of State-agency physicians Steven Akeson, Psy.D., and Paul Midden, Ph.D., who issued findings on August 27, 2020, and January 12, 2021, respectively. (Tr. 70-85, 87-110) The ALJ summarized Drs. Akeson and Midden's findings as follows:

> State-agency physicians [Akeson and Midden]…both concluded the claimant experienced moderate limitations in each of the four areas of mental functioning, and thus was able to understand and remember simple work activity, sustain concentration and persistence with simple work activity, should have limited social interaction with the public, coworkers, and supervisors, and would need gradually introduced and infrequent changes in his work setting.

(Tr. 20) The ALJ found the State-agency physicians' opinions generally persuasive, "in part because they are supported by Drs. Akeson and Midden's analyses of the evidence available when the findings were rendered." (*Id.*) The ALJ continued as follows:

> The four moderate limitations are consistent with the record as a whole, including mental status examinations reflecting at least some abnormalities such as a flat affect and some issues with delayed recall (*see e.g.*, Exhibit 7F). Also, the specific proposed limitations are largely fitting with the totality of the evidence, albeit a more careful review of the record shows instead that the claimant requires slightly different limits—as an example, he can tolerate interactions with coworkers and supervisors, but only as that contact pertains to simple, routine tasks and not tandem tasks; this is consistent with notations in the records indicating he is able to go in public alone, but avoids others in response to stressful situations (Exhibit 3E).

(*Id.*)

The ALJ then considered the June 27, 2020 findings of consultative examiner Sarah Lea, Ph.D., who

> assessed the claimant with PTSD and wrote it seemed unlikely he would be able to successfully concentrate, understand things, or apply information without significant assistance or accommodation, and may also struggle

> with adapting to new situations and interacting with authority figures. She
> also opined that if he were to engage in outpatient treatment, it was
> reasonable to expect moderate long-term improvement in his psychological
> functioning.

(Tr. 20) The ALJ found Dr. Lea's opinion partially persuasive, "in part given Dr. Lea sought to

support her conclusions with a thorough report detailing her observations of the claimant." (*Id.*)

The ALJ continued as follows:

> Although the proposed limitations indicating [Plaintiff] may struggle with
> authority figures and adapting to new situations are consistent with the
> record as a whole—including his frequent attempts to avoid others—the
> suggestion that he would require "significant assistance or accommodation"
> in concentrating, understanding things, or applying information is not
> consistent with the record as a whole. As an example, such limitations are
> in stark contrast to the claimant's own concessions that he is able to help
> care for his infant daughter, drive, go in public alone, and shop online.

(*Id.*)

Finally, the ALJ considered the opinion of impartial medical expert Sharon Kahn, Ph.D.

(Tr. 20-21)[8] The ALJ noted that Dr. Kahn "ultimately opined the claimant's mental symptoms

satisfied the criteria of listing 12.15, including finding he was markedly limited in all four

'paragraph B' areas of functioning (Exhibit 21F)." (Tr. 20) The ALJ found Dr. Kahn's opinion

was not persuasive, as follows:

> [M]uch of the reasoning [Dr. Kahn] provides to support her marked findings
> is merely citing to the claimant's subjective allegations that are in his favor
> and ignoring other contradictory statements (*e.g.*, he reported to the
> consultative examiner forgetting to pay the bills and having the electricity
> shut off, yet in his Function Report he wrote he managed all of his financial
> matters with no qualifying notations (such as needing help from his wife to
> do so) (Exhibits 3E/4; 7F/2)). Also, Dr. Kahn cites the claimant's subjective
> report of punching holes in walls when angry, but ignores the fact that when
> he made that remark to the consultative examiner, he additionally stated [it]
> had been nine months' or so since he had done that (Exhibit 7F), instead of
> supporting her conclusion with a clinical observation, such as being irritable

---

[8] Following Plaintiff's hearing, the ALJ sent a request for medical interrogatories to Dr. Kahn. (Tr. 10) Dr. Kahn provided her responses on October 9, 2022. (Tr. 10, 2319-2328)

or getting into a conflict with a healthcare provider (which is not evident in the record). Dr. Kahn does rely on at least a few objective signs to support her opinion—such as citing to the claimant's poor eye contact, poor motivation, and being difficult to engage (*citing* Exhibit 18F/101-03), but, such notations are more consistent with moderate limitations, versus marked limitations.

(Tr. 20-21)

After "careful consideration of the entire record," the ALJ determined that Plaintiff had the

RFC to perform sedentary work, but with the following limitations:

> He could never climb ladders, ropes or scaffolds or balance (as that term is defined in the Selected Characteristics of Occupations Appendix C, paragraph 3). He could occasionally climb ramps and stairs with a rail, but could never kneel, crouch or crawl. He must have avoided all exposure to full body vibration and workplace hazards such as unprotected heights. He had the ability to understand, remember, and carry-out simple, routine tasks. He could maintain attention and concentration sufficient to complete simple, routine tasks so long as no paced production requirements were present (no assembly line type work). He had the ability to make gradual, minimal changes in job duties or setting relative to simple, routine tasks. His job responsibilities were limited to working with things rather than people, and he was unable to tolerate contact with the public. His contact with coworkers and supervisors was limited to that involving simple, routine tasks but no tandem tasks.

(Tr. 16)[9]

Based on the vocational expert's testimony, the ALJ found that Plaintiff had the RFC to

perform jobs that existed in significant numbers in the national economy, such as document

preparer and bonder. (Tr. 22-23) The ALJ therefore concluded that Plaintiff had not been under

a disability, as defined in the Social Security Act, at any time from February 1, 2016, the alleged

onset date, through March 31, 2021, the date last insured. (Tr. 23)

## V.    Discussion

---

[9] The ALJ explained the genesis of each of his imposed limitations in great detail. (*See* Tr. 21-22)

13

Plaintiff claims the ALJ erred in failing to properly consider whether he met the listing of impairments for stressor related conditions at Listing 12.15.  (ECF No. 21)  He further claims the ALJ erred in determining his RFC, because substantial evidence did not exist in the record to support the RFC determination.  (*Id.*)  Finally, Plaintiff claims the hypothetical question the ALJ posed to the vocational witness failed to capture the concrete consequences of Plaintiff's impairments, and therefore the vocational expert's response did not represent substantial evidence on which the decision could rest.  (*Id.*)  The Commissioner counters that substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff is not disabled.  (ECF No. 22)

A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'"  *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] 'may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome.'"  *Id.* (internal quotation marks and citations omitted).

A court does not "'reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, the Court must affirm the ALJ's decision if "'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]'"  *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Listing 12.15 (Trauma and Stress-Related Disorders)

Plaintiff argues that the ALJ erred at step three of the sequential evaluation because he found Plaintiff's impairments did not meet the impairment in Listing 12.15, Trauma and Stress-Related Disorders.  (ECF No. 21, PP. 6-8)   The Commissioner counters the ALJ did not err, as he reasonably concluded Plaintiff failed to meet the listing.  (ECF No. 22, PP. 5-7)

 "'[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.'"  *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)).  "'That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits *without a determination whether he actually can perform his own prior work or other work.*'"  *Lott*, 772 F.3d at 549 (emphasis in original) (quoting *Sullivan*, 493 U.S. at 532).  "'If the claimant wins at the third step (a listed impairment), []he must be held disabled, and the case is over.'"  *Id.* (quoting *Jones v. Barnhart*, 335 F.3d 697, 699 (8th Cir. 2003)).

"'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.'"  *Igo v. Colvin*, 839 F.3d 724, 729 (8th Cir. 2016) (emphasis in original) (quoting *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010)).  "'An impairment that manifests only some of the [the listing] criteria, no matter how severely, does not qualify.'"  *Lott*, 772 F.3d at 549 (alteration in original) (quoting *McCoy*, 648 F.3d at 611-12).  Moreover, the "severity standards for Listing-level impairments are intentionally high, because the listings [for adults] were designed to operate as a presumption of disability that makes further inquiry unnecessary and ends the sequential process."  *Moss v. Berryhill*, No. 4:18-CV-189 NCC, 2019 WL 1275070, at *3 (E.D. Mo. Mar. 20, 2019) (alteration in original) (internal quotation marks and citations omitted).  The

15

claimant bears the burden of proving that an impairment or combination of impairments meets or equals the criteria for a specific listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

Section 12.15 has three paragraphs, including symptom criteria in paragraph A, and limitation criteria in paragraphs B or C. *Wisdom v. Kijakazi*, No. 4:20CV1837 DDN, 2022 WL 2966305, at *5 (E.D. Mo. Jul. 27, 2022). "Regardless of whether plaintiff satisfies the paragraph A criteria, [he] is not disabled unless [he] also satisfies paragraph B or paragraph C." *Id.* (footnote omitted).

In support of his contention that he meets the paragraph B criteria, Plaintiff notes an impartial medical expert, Dr. Sharon Kahn, was asked to comment on Plaintiff's conditions. Dr. Kahn opined that Plaintiff was markedly limited in all four areas of mental functioning listed for consideration in paragraph B, *i.e.*, the ability to understand, remember, or apply information; the ability to interact with others; the ability to concentrate, persist or maintain pace; and the ability to adapt or manage oneself. *See* Tr. 2325; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.15B.

Plaintiff maintains the ALJ failed to identify any medical findings that called into question Dr. Kahn's findings, and so "the decision went beyond evaluation or weighing of the evidence, and made unsupported conjecture regarding the findings of Dr. Kahn." (ECF No. 21, P. 7) The Commissioner counters that substantial evidence supports the ALJ's finding that Plaintiff did not satisfy the paragraph B criteria, because he has only moderate limitations in the four domains. (ECF No. 22; Tr. 14-15) Upon consideration, this Court agrees.

To satisfy the criteria of Listing 12.15, Plaintiff has the burden of satisfying paragraph A **and either** paragraph **or** C. *See* 20 C.F.R. Pt. 404, Subpt. P, § 12.15; *Johnson*, 390 F.3d at

1070.[10]  Paragraph B of the listing requires a showing of "extreme limitation of one or a marked limitation of two" of four areas of mental functioning.  *Wisdom*, 2022 WL 2966305, at *5.

Contrary to Plaintiff's claim the ALJ offered ample evidence, both medical and otherwise, to support his discounting of Dr. Kahn's findings.  The ALJ began his discussion of Listing 12.15 by noting Plaintiff's claimed mental limitations, as gleaned from both his hearing testimony and his Function Report.  (Tr. 14)  Plaintiff endorsed difficulties in understanding, following instructions (both written and spoken), completing tasks, memory, concentration, getting along with others, and handling stress and changes in routine.  (*Id.*)  The ALJ asserted that despite these allegations, Plaintiff remained able to participate in various typical activities of daily living, including helping to care for his child, preparing complete meals (with the help of his wife), managing his finances, shopping online, driving, and going out in public alone.  (*Id.*)

The ALJ then turned to a discussion of the four domains relevant to the paragraph B considerations.  Regarding Plaintiff's ability to understand, remember, and apply information, the ALJ noted the record described him as "a good historian, demonstrating normal judgment, and an intact remote and recent memory."  (Tr. 14)  The ALJ acknowledged that Plaintiff had trouble recalling words after a delay during a consultative examination, and that Plaintiff indicated he needed reminders to tend to his personal care tasks.  (*Id.*, citing Exhs. 7F/4; 9F/1, 2; 10F/14; 14F/147)  Based on these findings, the ALJ concluded Plaintiff had a moderate limitation in this area of functioning.  (*Id.*)

As to Plaintiff's ability to interact with others, the ALJ noted that while Plaintiff posted something threatening on a social media site in 2016, he also reported that he got along with his wife and child.  (Tr. 14)  Further, while at times Plaintiff's affect was described as flat, at other

---

[10] Plaintiff does not argue that he meets the C criteria.

times it was described as normal/appropriate, as was his mood.  (*Id.*)  Providers described Plaintiff as cooperative and polite.  (*Id.*)  The ALJ did note that Plaintiff complained to at least one provider that he suffered panic attacks when in crowds.  (Tr. 14-15, citing Exhs. 1F/13; 2F/16; 4F/47; 7F/1, 3; 9F/2; 10F/14; 12F/8; 14F/147)  Again, the ALJ found Plaintiff had a moderate limitation in this area.  (Tr. 14)

Regarding Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ noted that Plaintiff "was on time for the consultative examination, demonstrated appropriate attention and concentration, and was not easily distracted."  (Tr. 15)  Furthermore, records reflected that Plaintiff displayed normal attention, was alert and oriented, and was able to complete serial sevens backward without issue.  (*Id.*, citing Exhs. 7F, 9F)  The ALJ concluded that "even taking the claimant's allegations into account, he was no more than moderately limited in this area."  (*Id.*)

Finally, regarding Plaintiff's ability to adapt and manage himself, the ALJ acknowledged that Plaintiff complained of experiencing nightmares and flashbacks at times, being hypervigilant, and refusing to take his prescribed medications.  (Tr. 15)  The ALJ further acknowledged that while Plaintiff often presented with appropriate dress, he did appear for one therapy session "disheveled and wearing clothes that were inappropriate for the cold weather[.]"  (*Id.*)  The ALJ noted, however, that Plaintiff "often presented in no acute distress, did not show signs of psychosis, and did not require emergency or intensive inpatient treatment for exacerbations of mental health symptoms[.]"  (*Id.*, citing Exhs. 1F/2; 5F/15; 7F/2, 3; 9F/1; 14F/144)  Once again, the ALJ found Plaintiff suffered moderate limitation in this area of functioning.  (*Id.*)

"Assessment of [mental] functional limitations is a complex and highly individualized process that requires [the ALJ] to consider multiple issues and *all* relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation."  *See* 20 C.F.R. §

18

404.1520a(c)(1) (emphasis added).  Here, the ALJ considered the record as a whole, including medical opinions, prior administrative medical findings[11], and Plaintiff's daily activities, and concluded the "longitudinal picture" showed that Plaintiff had only moderate mental limitations. (Tr. 14-15)

The burden for establishing disability at step three is on Plaintiff, and "it is a particularly high burden."  *Moss*, 2019 WL 1275070, at *9.  *See also Heintz v. Berryhill*, No. 4:16CV1894 ACL, 2018 WL 1211172, at *6 (E.D. Mo. Mar. 8, 2018); *Simmons v. Colvin*, No. 4:14-CV-1670 NAB, 2015 WL 7758373, at *3-4 (E.D. Mo. Dec. 2, 2015).  Plaintiff did not satisfy the exacting burden here, as substantial evidence in the record supports the ALJ's conclusion that Plaintiff's impairments did not meet or medically equal those set forth in Listing 12.15.

C.  RFC Determination

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  *See also Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  *Moore*, 572 F.3d at 523 (internal quotation marks and citations omitted).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (internal quotation marks and citations omitted).  "However, there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citations omitted).  An

---

[11] As noted above, the ALJ provided ample explanation for his rejection of Drs. Lea and Kahn's opinions as partially and not persuasive, respectively.  (Tr. 20-21)

ALJ "is not limited to considering medical evidence exclusively," as even though the "RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citations omitted). While the Court recognizes that an ALJ "may not draw upon his own inferences from medical reports," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), the Eighth Circuit has held that the "interpretation of physicians' findings is a factual matter left to the ALJ's authority." *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (citation omitted).

Plaintiff claims the ALJ erred in determining his physical and mental RFC because the finding was not supported by substantial evidence. (ECF No. 21, PP. 8-19) More specifically, Plaintiff contends that the ALJ's decision did not create a logical bridge between Plaintiff's cited activities of daily living and the finding that he could complete eight hours of sedentary, unskilled work. (*Id.*, P. 15) The Commissioner counters that substantial evidence in the record as a whole supports the ALJ's RFC determination. (ECF No. 22, PP. 8-14)

1. Physical RFC

Plaintiff argues that the daily activities cited by the ALJ do not demonstrate that Plaintiff could perform work activity eight hours a day, and that records from the VA support greater functional limitations. Responding, the Commissioner asserts that the RFC is supported by substantial evidence.

The Court holds that substantial evidence supports the ALJ's decision, for several reasons. First, the ALJ acknowledged Plaintiff's reported limitations and daily activities, as set forth in his hearing testimony and his Function Report. (Tr. 16-17) For example, the ALJ noted that Plaintiff complained of problems with, among other areas, his back (including right-sided sciatic nerve pain, herniated and bulging discs, and numbness in his legs), left ankle (including two surgeries),

and right knee. (*Id.*) The ALJ further noted Plaintiff reported falling on occasion, and described difficulties with lifting, sitting, climbing stairs, squatting, kneeling, bending, standing, and walking. (Tr. 17) However, the ALJ wrote that despite these allegations, Plaintiff remained "able to engage in various typical activities of daily living", such as helping to care for his child (including changing her diaper, feeding and interacting with her, and picking up her toys), preparing complete meals (with the help of his wife), managing his finances, shopping online, driving, and going out in public alone. (*Id.*) The ALJ properly considered such activities inconsistent with a contention of complete disability. *See Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (finding that caring for and transporting young children, performing housekeeping tasks, managing the sale of the family home and negotiating with the builders of a new home were inconsistent with allegations of disability); *Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (finding that caring for a young child, preparing meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary were inconsistent with allegations of disability).

The ALJ further spent several pages discussing in detail the medical treatment Plaintiff received for his back, left ankle and right knee. (Tr. 17-19) For example, the ALJ noted that Plaintiff sought emergency care for his ankle pain in March 2018, and imaging showed a nondisplaced distal fibular fracture. (Tr. 17) Although Plaintiff was given crutches, the ALJ noted that it did not appear they were to be used on an ongoing basis, and "[r]ecent imaging documented stable and chronic degenerative and posttraumatic changes (a distal fibular shaft fracture which healed, and a partially healed calcaneal anterior process fracture)[.]" (Tr. 17-18, citing Exhs. 3F/16, 17; 3F/2; 14F/15, 63)

21

The ALJ further noted Plaintiff complained of right knee pain in late 2020, and imaging showed mild patellofemoral compartment degenerative changes.  (Tr. 18, citing Exhs. 12F/2, 18F/85)  However, although Plaintiff reported to the consultative examiner that he anticipated undergoing a total knee replacement, the record did not reflect that he had done so.  (*Id.*, citing Exh. 7F/2)

With respect to back issues, the ALJ noted that Plaintiff sought emergency care in March 2020, and imaging revealed, among other things, mild to moderate degenerative changes, mild and moderate bulging discs, and mild to severe stenosis.  (Tr. 18, citing Exh. 12F/3-4)  The ALJ noted Plaintiff underwent a left L4/5 lumbar microdiscectomy on July 8, 2020, and an examination one month later "showed mildly positive straight leg raise testing and an antalgic gait, but…intact sensation, and normal range of motion and strength in all extremities[.]"  (Tr. 18-19, citing Exhs. 9F/5-6; 9F/1-2, 4)

The ALJ concluded his discussion as follows:

> While there are various notations in the record documenting some abnormalities—such as an abnormal gait or limp, lumbar spasm and/or tenderness (*see e.g.*, Exhibits 2F; 3F/8, 12), the claimant simply has not sought out the type or frequency of care anticipated for disabling musculoskeletal conditions.  As an example, he was evaluated by a primary care provider on August 9, 2018 through the Veteran's Administration, but as of early 2020, he had not followed up there (Exhibit 5F/15)  It does not appear from the current record that the claimant had followed with any specialists on a regular basis  during the period in question, either, such as a pain management provider or orthopedist.  As detailed above, he was referred for treatments like physical therapy and surgery, but did not follow through on such referrals in a terribly timely fashion.  He repeatedly indicated he was not taking any medications.  This lack of treatment, taken into consideration with mixed physical examination results and the claimant's ability to stay home and care for his daughter by himself, instead suggests he was capable of performing work within the confines of the above residual functional capacity.

(Tr. 19)

Finally, the ALJ considered the physical medical opinion evidence in the record. (Tr. 19-20) Plaintiff filed his application for benefits after March 2017. Accordingly, the ALJ's treatment of medical opinion evidence is governed by 20 C.F.R. § 416.920c. Under this regulation, ALJs are to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors – supportability, consistency, the medical source's relationship with the claimant, specialization, and other factors such as the source's understanding of the Social Security Administration's disability policies. 20 C.F.R. § 416.920c(c). ALJs must "articulate in [their] determination or decision how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b).

In evaluating the persuasiveness of a medical opinion, the factors of supportability and consistency are the most important for an ALJ to consider, and the ALJ must "explain how [he] considered the supportability and consistency factors . . . in [the] determination or decision." 20 C.F.R. § 416.920c(b)(2).[12] An ALJ's failure to address either the consistency or supportability factor in assessing the persuasiveness of a medical opinion requires reversal. *Bonnett v. Kijakazi*, 859 Fed. Appx. 19, 20 (8th Cir. 2021) (unpublished) (per curium) (citing *Lucas v. Saul*, 960 F.3d 1066, 1069-70 (8th Cir. 2020) (remanding where ALJ discredited physician's opinion without discussing factors contemplated in regulation, as failure to comply with opinion-evaluation regulation was legal error)). *See also Starman v. Kijakazi*, No. 2:20-CV-00035- SRC, 2021 WL

---

[12] "Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

"Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

4459729, at *5 (E.D. Mo. Sept. 29, 2021).  An ALJ need not explain in his or her decision how he or she considered the other factors.  20 C.F.R. § 416.920c(b)(2).

As noted above, on August 27, 2020 Dr. Renu Debroy, a non-examining physician, reviewed certain evidence and completed a Physical Residual Functional Capacity Assessment. (Tr. 70-85)  Non-examining physician Dr. Michael O'Day did the same on January 27, 2021.  (Tr. 87-110)  In their opinions, Drs. Debroy and O'Day found that Plaintiff had the following medically determinable impairments:  spine disorders, primary, severe; and hyperlipidemia, non-severe.  (Tr. 76, 95)  They stated that Plaintiff had exertional limitations as follows:  lift and/or carry 10 pounds occasionally[13] and less than 10 pounds frequently[14]; stand and/or walk (with normal breaks) for about 2 hours in an 8-hour workday; sit (with normal breaks) for a total of 6 hours in an 8-hour workday; and push and/or pull on an unlimited basis.  (Tr. 79, 99)  Drs. Debroy and O'Day opined that Plaintiff had postural limitations as follows:  occasionally climb ramps, stairs, ladders, ropes and scaffolds; occasionally stoop, kneel, crouch and crawl; and frequently balance.  (Tr. 79, 99-100)  The doctors stated Plaintiff had no manipulative, visual or communicative limitations, but should avoid concentrated exposure to vibration and hazards including machinery and heights. (Tr. 80, 100-101)  The doctors did not limit Plaintiff's exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, or poor ventilation.  (*Id.*)  Drs. Debroy and O'Day concluded that Plaintiff demonstrated the maximum sustained work capability for sedentary exertional work.  (Tr. 84, 108)

As noted above, the ALJ found Drs. Debroy and O'Day's conclusions partially persuasive, as they "attempted to support their conclusions with summaries of the evidence available when the

---

[13] "Occasionally" is defined as "cumulatively 1/3 or less of an 8 hour day."  (Tr. 79)
[14] "Frequently" is defined as "cumulatively more than 1/3 up to 2/3 of an 8 hour day."  (Tr. 79)

findings were rendered." (Tr. 20)  The ALJ noted the findings were not entirely consistent with the record as a whole, however, as subsequently received evidence, including Plaintiff's hearing testimony, demonstrated that Plaintiff required greater limitations.  (*Id.*)  The ALJ therefore went further than Drs. Debroy and O'Day in several respects, by stating Plaintiff must never climb ladders, ropes or scaffolds; never balance; never kneel, crouch or crawl; and avoid all exposure to full body vibration and workplace hazards such as unprotected heights.  (Tr. 16)

Upon consideration of the foregoing, the Court finds the ALJ reached his conclusion based upon all the evidence in the record, including Plaintiff's testimony and activities of daily living, and the medical evidence and opinions in the record.  Although Plaintiff is correct that there are medical records showing abnormal or hesitant gait, limping, limited range of motion and decreased lower extremity strength (ECF No. 21, PP. 15-18), this Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence on the record as a whole.  *See* 42 U.S.C. §§ 405(g); 1383(c)(3);  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  As long as there is substantial evidence in the record that supports the decision, this Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  *See also Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (internal quotation marks and citation omitted) (An ALJ's decision is not to be disturbed "so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.").  Here, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice.  *See Fentress v. Berryhill*, 854 F.3d 1016, 1021

25

(8th Cir. 2017).  The Court therefore finds that substantial evidence supported the ALJ's physical RFC determination.[15]

2.   Mental RFC

Plaintiff argues that the daily activities cited by the ALJ do not demonstrate he could perform work activity eight hours a day.  Responding, the Commissioner asserts that the mental RFC is supported by substantial evidence.

The Court again holds that substantial evidence supports the ALJ's decision, for several reasons.  First, as noted above the ALJ acknowledged Plaintiff's reported limitations and daily activities, as set forth in his hearing testimony and his Function Report.  (Tr. 16-17)  For example, the ALJ noted Plaintiff endorsed mental health symptoms, "including but not limited to deficits in social interaction, concentration, memorizing and recalling information."  (Tr. 16)  The ALJ further noted that in his Function Report, Plaintiff "endorsed issues with understanding, following instructions, completing tasks, memory, concentration, and getting along with others, and further complained of specific problems in handling stress and changes in routine."  (*Id.*)  Again, however, the ALJ wrote that despite these allegations, Plaintiff remained "able to engage in various typical activities of daily living", such as helping to care for his child (including changing her diaper, feeding and interacting with her, and picking up her toys), preparing compete meals (with the help of his wife), managing his finances, shopping online, driving, and going out in public alone.  (Tr.

---

[15] Rather than ignoring Plaintiff's medical history and subjective complaints, the ALJ limited Plaintiff, a young man, to sedentary work with numerous additional limitations.  (Tr. 16) "'Sedentary work' represents a significantly restricted range of work, and individuals with a maximum sustained work capacity limited to sedentary work have very serious functional limitations.'"  *Fields v. Astrue*, No. 2:11CV35 FRB, 2012 WL 6705863, at *14 (E.D. Mo. Dec. 26, 2012) (citing 20 C.F.R. Pt. 404, subpt. P, app. 2 § 201.00(h)(4)).

17)  The ALJ properly considered such activities inconsistent with a contention of complete disability.

The ALJ further discussed the medical treatment Plaintiff received for his mental impairments.  (Tr. 17)  The ALJ noted that while Plaintiff engaged in mental health care treatment in 2016 for a brief period, he did not follow up with any regularity, missed several therapy appointments in 2018 and 2019, and often refused to take prescribed medications.  (*Id.*, citing Exhs. 1F, 5F/16, 14F/144)  The ALJ stated that while Plaintiff "was disheveled, poorly dressed and made poor eye contact" during a therapy session in January 2020, he also reported staying home and caring for his 3-year old daughter all day.  (*Id.*, citing Exh. 5F/15)  With respect to Plaintiff's mental status examination results, the ALJ stated they "were mixed—sometimes being unremarkable, and on other occasions recording notable items (but still not signs of psychosis or marked or extreme symptoms)."  (*Id.*)  Based on the foregoing, the ALJ found that Plaintiff "experienced moderate limits in each of the four areas of mental functioning, and thus appropriate corresponding limitations have been incorporated into his residual functional capacity as detailed below." (*Id.*)

Finally, the ALJ considered the mental medical opinion evidence in the record.  (Tr. 20-21)  As noted above, State-agency physicians Steven Akeson, Psy.D., and Paul Midden, Ph.D., issued findings on August 27, 2020, and January 12, 2021, respectively.  (Tr. 70-85, 87-110)  Drs. Akeson and Midden completed Mental Residual Functional Capacity Assessments, and found that Plaintiff was moderately limited in his ability to:  understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from

supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (Tr. 82-83, 103-107)[16]  The doctors concluded Plaintiff was able to engage in simple work activity, but would be best suited for a work environment with limited social interactions, and would need for changes in the work setting to be introduced gradually and infrequently.  (*Id.*)

The ALJ found the State-agency physicians' opinions were generally persuasive, "in part because they are supported by Drs. Akeson and Midden's analyses of the evidence available when the findings were rendered."  (Tr. 20)  The ALJ continued as follows:

> The four moderate limitations are consistent with the record as a whole, including mental status examinations reflecting at least some abnormalities such as a flat affect and some issues with delayed recall (*see e.g.*, Exhibit 7F).  Also, the specific proposed limitations are largely fitting with the totality of the evidence, albeit a more careful review of the record shows instead that the claimant requires slightly different limits—as an example, he can tolerate interactions with coworkers and supervisors, but only as that contact pertains to simple, routine tasks and not tandem tasks; this is consistent with notations in the records indicating he is able to go in public alone, but avoids others in response to stressful situations (Exhibit 3E).

(*Id.*)

Dr. Sarah Lea, PhD., engaged in a consultative examination of Plaintiff on June 17, 2020.  (Tr. 763-770)  Dr. Lea observed that Plaintiff answered all questions posed, was dressed appropriately for the season and occasion, made consistent eye contact, "and his verbal and nonverbal communication was well integrated."  (Tr. 765)  She stated Plaintiff reported his mood to be "content", but his affect was flat with a limited display of emotion.  (*Id.*)  She further said Plaintiff "had appropriate attention and concentration and was not easily distracted."  (Tr. 766)  After reviewing Plaintiff's medical records and information gathered during the consultation

---

[16] Drs. Akeson and Midden concluded Plaintiff was not significantly limited in all other areas under consideration.  (Tr. 82-83, 104-107)

interview, Dr. Lea concluded Plaintiff continued to meet the diagnostic criteria for PTSD.  (Tr. 768)  She continued as follows:

> It should be noted that Ryan did appear to struggle somewhat with understanding, remembering, and applying information, for example remembering a series of words and letters remotely.  Furthermore, Ryan's records and self-report indicated he frequently struggles with concentration, persistence, and maintaining pace.  These symptoms are likely related to both his mental health and physical health diagnoses.  It seems unlikely that Roger {sic} would currently be able to successfully concentrate, understand things, or apply information without significant assistance or accommodation.  Because of his PTSD diagnoses, Ryan may also struggle with adapting to new situations and with interacting with authority figures.  Ryan noted throughout the interview that he strongly prefers to not interact with people at all.  Lastly, Ryan noted that he is not able to maintain household finances because of his short-term memory problems.

(Tr. 768)

As noted above, the ALJ found Dr. Lea's opinion partially persuasive, "in part given Dr. Lea sought to support her conclusions with a thorough report detailing her observations of the claimant."  (Tr. 20)  The ALJ continued as follows:

> Although the proposed limitations indicating [Plaintiff] may struggle with authority figures and adapting to new situations are consistent with the record as a whole—including his frequent attempts to avoid others—the suggestion that he would require "significant assistance or accommodation" in concentrating, understanding things, or applying information is not consistent with the record as a whole.  As an example, such limitations are in stark contrast to the claimant's own concessions that he is able to help care for his infant daughter, drive, go in public alone, and shop online.

(*Id.*)

Finally, Dr. Sharon Kahn, Ph.D., provided her professional opinion as to Plaintiff's limitations on October 9, 2022.  (Tr. 2319-2328)  Dr. Kahn did not personally examine Plaintiff, but instead relied on the evidence provided.  Dr. Kahn stated Plaintiff was moderately limited in his ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions.  (Tr. 2320)  She stated he was markedly limited in

29

his ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  (*Id.*)  Dr. Kahn further opined that Plaintiff was markedly limited in his ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and changes in a routine work setting.  (Tr. 2321)  Finally, Dr. Kahn noted Plaintiff's other capabilities, such as the ability to concentrate, persist, or maintain pace and the ability to adapt or manage oneself, were also affected by his impairment.  (*Id.*)  Dr. Kahn supported her conclusions with citations to the medical evidence of record, and ultimately concluded Plaintiff's mental symptoms satisfied the criteria of Listing 12.15, as he was markedly limited in all four 'paragraph B' areas of functioning.  (Tr. 2325-2327)

As noted above, the ALJ found Dr. Kahn's opinion was not persuasive, as follows:

> [M]uch of the reasoning [Dr. Kahn] provides to support her marked findings is merely citing to the claimant's subjective allegations that are in his favor and ignoring other contradictory statements (*e.g.*, he reported to the consultative examiner forgetting to pay the bills and having the electricity shut off, yet in his Function Report he wrote he managed all of his financial matters with no qualifying notations (such as needing help from his wife to do so) (Exhibits 3E/4; 7F/2)).  Also, Dr. Kahn cites the claimant's subjective report of punching holes in walls when angry, but ignores the fact that when he made that remark to the consultative examiner, he additionally stated [it] had been nine months' or so since he had done that (Exhibit 7F), instead of supporting her conclusion with a clinical observation, such as being irritable or getting into a conflict with a healthcare provider (which is not evident in the record).  Dr. Kahn does rely on at least a few objective signs to support her opinion—such as citing to the claimant's poor eye contact, poor motivation, and being difficult to engage (*citing* Exhibit 18F/101-03), but, such notations are more consistent with moderate limitations, versus marked limitations.

(Tr. 20-21)

"Once the ALJ has decided how much weight to give a medical opinion, the Court's role is limited to reviewing whether substantial evidence supports this determination, not

deciding whether the evidence supports the plaintiff's view of the evidence." *Beamer v. Saul*, No. 2:18-CV-00094 JAR, 2020 WL 1511350, at *7 (E.D. Mo. Mar. 30, 2020) (citation omitted). *See also Couch v. Berryhill*, No. 2:18 CV 46 DDN, 2019 WL 1992623, at *6 (E.D. Mo. May 6, 2019) (same).

Upon consideration of the foregoing, the Court finds the ALJ did not simply substitute his own interpretation for Drs. Lea and Kahn's opinions.[17]  Instead, the ALJ reached his conclusion based upon all the evidence in the record, including Plaintiff's testimony and activities of daily living, and the medical evidence and opinions in the record.  Although Plaintiff is correct that there are medical records showing Plaintiff was mildly guarded, with dysphoric mood, limited insight, mildly impaired judgment and poor concentration (ECF No. 21, P. 16), this Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence on the record as a whole.  *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Pate-Fires*, 564 F.3d at 942; *Estes*, 275 F.3d at 724.  As long as there is substantial evidence in the record that supports the decision, this Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Haley*, 258 F.3d at 747.  *See also Buckner*, 646 F.3d at 556 (internal quotation marks and citation omitted) (An ALJ's decision is not to be disturbed "so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.").

The ALJ concluded that although Plaintiff's mental impairments resulted in moderate limitations in understanding, remembering or applying information, interacting with others,

---

[17] The ALJ largely adopted the limitations proposed by Drs. Akeson and Midden.

concentrating, persisting or maintaining pace, and adapting or managing himself, he had the mental RFC to perform sedentary work with added limitations.  (Tr. 14-16)  The ALJ stated that he had reached his conclusion "[a]fter careful consideration of the entire record[.]"  (Tr. 16)  The Court notes the record contains evidence that Plaintiff reported participating in a number of daily activities, including helping to care for his child, preparing compete meals (with the help of his wife), managing his finances, shopping online, driving, and going out in public alone.  (Tr. 17)  Furthermore, Plaintiff reported seeking treatment for mental health symptoms only sporadically, and refusing to take prescribed medications.  (*Id.*)  Under these circumstances, the Court finds that substantial evidence supports the ALJ's mental RFC determination.

      D.      Improper Hypothetical Posed to the Vocational Expert

Plaintiff finally asserts "the hypothetical question to the vocational witness in this matter did not capture the concrete consequences of Plaintiff's impairment, and therefore, the response of the vocational expert witness does not represent substantial evidence upon which the decision may rest."  (ECF No. 21, PP. 19-20)  Specifically, Plaintiff maintains the ALJ did not include the limitation that Plaintiff would require significant assistance in performing, and therefore the vocational expert's response was based on an improper premise.

As noted by the Commissioner, "[a]lthough the hypothetical question must set forth with reasonable precision the claimant's impairments, it need only include those impairments and limitations the ALJ finds consistent with the record as a whole."  (ECF No. 22, P. 14, citing *Heino v. Astrue*, 578 F.3d 873, 882 (8th Cir. 2009) (citation omitted) ("[W]e have held that a hypothetical question posed to a VE need not include allegations that the ALJ found not credible.")).  Here, the

ALJ's hypothetical properly incorporated the restrictions that he found to be credible[18], and so this portion of Plaintiff's argument must be denied.

### VI.    Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from February 1, 2016, the alleged onset date, through March 31, 2021, the date last insured[.]"  (Tr. 23)

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of March, 2025.

---

[18] The Court previously found the ALJ's findings regarding the impairments from which Plaintiff suffered were based on substantial support in the record, and he did not error in posing a hypothetical which did not include discredited allegations.  *See Heino*, 578 F.3d at 882.